UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

     Plaintiff,

  v.

MICHAEL WILLIAMS,

     Defendant.

_____

     REPORT & RECOMMENDATION

     12-CR-6152G

## PRELIMINARY STATEMENT

    By order of Hon. David G. Larimer, United States District Judge, dated

November 1, 2012, all pretrial matters in the above-captioned case have been referred to this

Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 38).  On January 15, 2013, this case

was transferred to United States District Judge Frank P. Geraci, Jr.  (Docket # 45).

    On November 1, 2012, the grand jury returned a single-count indictment against

defendant Michael Williams ("Williams") charging him with sex trafficking of a minor, in

violation of 18 U.S.C. §§ 1591(a)(1), 1591(b)(2) and 2.  (Docket # 37).  Currently pending

before the Court are Williams's motions to suppress evidence seized as a result of a warrantless

entry into and search of 204 Caroline Street on February 8, 2012 and evidence of a photographic

identification procedure conducted several hours later, as well as to dismiss the indictment.

(Docket ## 53, 86, 106).[1]  For the reasons discussed below, I recommend that the district court

deny Williams's motions.

_____

  [1]  Williams's omnibus motions also sought, *inter alia*, a bill of particulars, *Brady* material, discovery and
inspection, disclosure of Rule 404, 608 and 609 evidence, identification of informants, *Jencks* material, and

## THE SUPPRESSION MOTIONS

Williams seeks to suppress evidence seized as a result of a warrantless search of the apartment at 204 Caroline Street in Rochester, New York, on February 8, 2012. Although no tangible evidence was seized from the apartment at that time, information obtained from a computer in plain view led to the subsequent issuance of a warrant to seize the computer and the apprehension of a missing minor who implicated Williams in the criminal conduct with which he is charged. (Docket # 53 at 46-49).

The government has conceded that Williams, who was present in the apartment at the time of the search, has standing to challenge the intrusion into the apartment. (Docket # 57 at 11).

Evidentiary hearings were conducted on the suppression motions on June 14, 2013, October 11, 2013 and November 6, 2013.[2] (Docket ## 63, 75, 76). Following the hearings, both parties submitted post-hearing submissions. (Docket ## 86, 89). The government argued in post-hearing submissions that the warrantless entry into 204 Caroline Street was justified by the consent of a third party and by the exigent circumstances doctrine. (Docket # 89 at 9-13). At further oral argument requested by the defendant, this Court addressed with counsel whether the emergency aid doctrine justified the warrantless entry. (Docket # 92). Over the defendant's objection, this Court granted the government's application to reopen the hearing to adduce additional testimony relating to the applicability of that doctrinal exception to the warrant requirement. (Docket ## 92, 93). Various extensions were granted at the request of the defense,

---

preservation of rough notes. (Docket # 53). Each of the motions was decided by the undersigned or resolved by the parties in open court on May 13, 2013. (Docket # 59).

[2] The delay in the continuation of the hearing from June 14, 2013 until October 11, 2013 was caused by the appointment of new counsel for Williams.

and the hearing was continued on June 20, 2014 and August 28, 2014.  (Docket ## 94, 100).[3]

Supplemental post-hearing memoranda were submitted by the government on October 6, 2014

(Docket # 106) and the defendant on January 3, 2015 (Docket # 110).


## FACTUAL BACKGROUND

### I.   Testimony of Joel Hasper

Joel Hasper ("Hasper"), a police officer with the Rochester Police Department

("RPD"), testified that he and Officer Matthew Lebeda responded to a 911 call from Saranac

Street in Rochester on February 8, 2012, at approximately 3:50 or 3:55 p.m.  (Tr. B 95-97, 107).

The individual who placed the 911 call reported her belief that her niece was being held against

her will.  (Tr. B 97).  When Hasper and Lebeda arrived at the Saranac Street residence, the

missing person's aunt and cousin were present.  (*Id.*).  Sergeant Webster also arrived on the

scene.  (Tr. B 116).

The aunt first informed Hasper that her niece T.J. ("TJ") had been missing and

was a runaway; she then told him that she had learned from her son that her niece was being held

against her will.  (Tr. B 97, 116-17).  Hasper spoke to TJ's cousin, Nicholas Justiniano

("Justiniano").  (Tr. B 97-99).  Justiniano showed Hasper various text communications on his

cell phone that he said were from TJ.  (*Id.*).  He also showed Hasper on his cell phone an

advertisement for escort services on Backpage.com.  (*Id.*).  The advertisement included a

photograph of a scantily-clad girl using the name "Ashley" whom Justiniano identified as TJ,

---

[3]   The transcript of the June 14, 2013 hearing shall be referred to as "Tr. A ___" (Docket # 71); the transcript of the October 11, 2013 hearing shall be referred to as "Tr. B ___" (Docket # 80); the transcript of the November 6, 2013 hearing shall be referred to as "Tr. C ___" (Docket # 81); the transcript of the June 20, 2014 hearing shall be referred to as "Tr. D ___" (Docket # 101); and, the transcript of the August 28, 2014 hearing shall be referred to as "Tr. E ___" (Docket # 102).

along with "a white female" identified in the advertisement as "Chrissy."  (Tr. B 97-98).  The advertisement was entitled, "2 is so much more fun than just one," stated, "We offer DOUBLES" and provided a phone number of (585) 285-3898.  (Government's Exhibit ("G. Ex.") 5).  The advertisement further provided, "Location: Rochester, My place? Southwedge . . . Or yours?"  (G. Ex. 5; Tr. B 102).

Justiniano reported to Hasper that when he saw the Backpage.com advertisement, he  communicated with TJ by text message, although Hasper was unable to recall who initiated the first communication.  (Tr. B 103-04).  Justiniano reported that he began to communicate with TJ shortly after 2:00 p.m. that day and that she told him that she could not leave because she was afraid of being beaten.  (Tr. B 103-04, 123).  The text messages that Justiniano showed Hasper were consistent with Justiniano's reports.  (Tr. B 104, 123).

Hasper immediately began to try to locate the two phones associated with TJ – the one listed in the advertisement and the one with which Justiniano was communicating.  (Tr. B 102, 104).  Working with others, Hasper identified the carrier for the phones and obtained subscriber information for the phones.  (Tr. B 102-03).  Both phones were registered to the same individual on Sherman Street on the west side of Rochester.  (*Id.*).  Another police officer was dispatched to the Sherman Street residence, but did not locate the identified subscriber or TJ there.  (Tr. B 103, 122).

Hasper returned to the East Side police station at about 6:00 p.m.  (Tr. B 107).  At that time, he contacted the cell phone carrier and learned that the phone that was being used to communicate with Justiniano "hit off the 500 South Avenue cell tower . . .[,] meaning that the cell call text, the signal was coming south of that location."  (Tr. B 108, 120).  Hasper testified that investigating officers were then able to determine that the person identified in the

Backpage.com advertisement as "Chrissy" was in fact Chelsea Willenborg.  (Tr. B 109).  Police records revealed that Willenborg was currently on probation and had a listed address of 204 Caroline Street, Rochester, which was in the "Southwedge" neighborhood.  (*Id.*).  According to Hasper, Caroline Street runs off South Avenue.  (*Id.*).  The investigating officers then confirmed with the Monroe County Probation Department that the Southwedge address was an "updated" address.  (*Id.*).

Based upon the text messages indicating that TJ was being held on a street off of South Avenue, the phone "ping" off the South Avenue cell tower, the Backpage.com advertisement identifying the Southwedge as the location, and Chrissy's verified address of 204 Caroline Street off of South Avenue, the investigating officers decided to go to 204 Caroline Street.  Hasper testified that the officers met two probation officers on South Clinton Avenue on their way to Caroline Street.  (Tr. B 109-10, 125).  Hasper, the two probation officers, Sergeant Webster, Officer Lebeda, and Investigators Shuman, Gould and Turner then proceeded to 204 Caroline Street.  (Tr. B 109-10, 126).

After other officers entered the premises at 204 Caroline Street, Hasper went inside to "stand with" the defendant, who was in the living room of the apartment.  (Tr. B 111-12, 126-27, 146).  Hasper obtained pedigree information from Williams.  (Tr. B 112, 129-30).  According to Hasper, Williams would not comply with his directions to remain still and refrain from using his cell phone so he was handcuffed and placed in Hasper's car.  (Tr. B 113-14, 133-34, 151).  While Hasper was detaining Williams, he did not observe any officers looking in drawers or cupboards; according to him, the officers were searching for people.  (Tr. B 148-49).  Approximately an hour after the officers arrived at 204 Caroline Street, Hasper drove Williams to the East Side police station.  (Tr. B 114, 128).

II.     <u>**Testimony of Matthew Lebeda**</u>

Matthew Lebeda ("Lebeda"), a police officer with the RPD, testified that he and Hasper responded to a 911 call from Saranac Street in Rochester sometime after 3:00 p.m. on February 8, 2012.  (Tr. C 5-6, 19).  The 911 dispatch log reflects that they were dispatched at 3:56 p.m. and arrived at the Saranac Street residence at 4:00 p.m.  (Tr. E 54; G. Ex. 7). According to Lebeda, the emergency call reported that a minor had possibly been abducted. (Tr. C 6).  The dispatch log reflects that the complainant called 911 to report that the caller's sixteen- year-old niece was allegedly being held against her will for prostitution.  (Tr. E 53-54; G. Ex. 7).

When Lebeda and Hasper arrived, they spoke to the minor's cousin and aunt. (Tr. C 6-7).[4]  The minor's cousin, Justiniano, informed the officers that when he was in school he had seen a photograph of his cousin TJ in a Backpage.com advertisement.  (Tr. A 7).  Justiniano showed Lebeda his cell phone which he stated contained text messages between TJ and him. (Tr. C 7-8).  According to Lebeda, two of the messages had been exchanged before he arrived on scene, while others were exchanged after he arrived.  (Tr. C 8-9, 18-19).  He testified that he transcribed them verbatim onto an incident report form, except that he converted the time into military time.  (Tr. C 9-13; Tr. E 26-27; G. Ex. 6).  Lebeda explained that he transcribed the first two text messages while he was at Saranac Street and the remainder at the East Side police station later that afternoon.  (Tr. E 12-13).  Lebeda returned to the East Side station at approximately 5:17 p.m.  (Tr. E 54; G. Ex. 7).

---

[4] Lebeda initially misidentified the woman as TJ's mother rather than her aunt.  (Tr. C 7).

According to Lebeda, Justiniano met him at the East Side station after Lebeda left Saranac Street.  (Tr. E 23).  After Lebeda finished transcribing the text messages from Justiniano's phone, Lebeda began to work on obtaining the GPS location for the phone number from which TJ was texting Justiniano.  (Tr. E 15-16).  Lebeda testified that as he was investigating the GPS location, Justiniano returned to the East Side police station with another male.  (Tr. E 16).  Justiniano and the male met Lebeda and Sergeant Webster in the hall, and Justiniano told them that he had received information that TJ might have been with Chelsea Willenborg.  (Tr. E 16-17).  Lebeda immediately disseminated that information to the investigators.  (Tr. E 17).  Lebeda testified that he looked up Chelsea Willenborg on Facebook and found a photograph of Willenborg and TJ together.  (Tr. E 49).

Lebeda testified that he went directly to 204 Caroline Street from the East Side station and did not stop at the Probation Department en route.  (Tr. E 51-52).  The log reflects that the officers went to Caroline Street at approximately 9:53 p.m.  (Tr. E 55, 59; G. Ex. 7).

According to Lebeda's investigative action report, which he testified contains a verbatim transcription of the text messages that he saw on Justiniano's phone, the first text message he was shown was an incoming message at 14:57 (2:57 p.m.) from 585-513-3937, the number Justiniano identified as TJ's cell phone:

> I don't want to do this but the guy who tricked me into this shit
> won't let me[.]  I'm not fucking no one thow cause I just can't do
> that to myself and if I tell u where I'm at I will get beat.

(G. Ex. 6).[5]  Justiniano responded at 15:04, "Cuzz I can fix diz let me know w[h]ere u at." Subsequent text messages between the two phones include the following messages:

---

[5]  Over Williams's objection, this Court admitted two pages of Lebeda's report reflecting the messages he testified he transcribed from Justiniano's phone.

• TJ:    Please don't tell no one (16:15)

• J:    Talk to me then (16:23)

• TJ:    Don't call me cuz theres 3 Big ass nikkaz here and they will take the fone and beat me if they find out it's u (16:30)

•TJ:    come at night (16:35)

• J:    w[h]ere? (16:35)

•TJ:    I'll tell you later just in case they take the phone from me but its off south av (16:37)

•TJ:    and I ain't do nada but sleep and smoke (16:38)

•TJ:    I'm scared to leave wat if they wake up (17:26)

•TJ:    are u sure you can get me (18:27)

•J:    yes just need to let me know w[h]ere? (18:29)

•TJ:    Don't' come now (18:31)

•J:    O.K.  W[h]ere u want me 2 pik u up at? and wat time so I kno to leave work? (18:33)

•TJ:    I am sorry ☹ (18:33)

•J:    There's nothing to be sorry bout . . . u need me u need me (18:34)

•TJ:    where u goin to take me? (18:35)

•TJ:    when u get outta work (18:41)

•J:    I asked to leave at 7 so I'll be out then took my momz car to work (18:4_)[6]

(G. Ex. 6).

At the hearing, Williams introduced a forensic report prepared by the government

identifying the text messages that were on TJ's cell phone when she was found later that night at

---

[6] The last digit is illegible.

the Best Western Hotel.  (Tr. E 5-6).  Of the text messages set forth above, only the second

appears on the report ("Cuzz I can fix diz plz let me kno were u at").[7]  (Tr. E 7, 37-46; D. Ex. J).

Although no witness testified as to the explanation, if any, for the discrepancy, the prosecutor

posited that TJ could have deleted the messages from her phone before she was found.  (Tr. E

8-9).


### III.    Testimony of Stuart Shuman

Stuart Shuman ("Shuman"), an investigator with the RPD, testified that shortly

after his shift began at 4:00 p.m. on February 8, 2012, he received a call from Sergeant Webster

to advise him that his assistance might soon be needed in connection with an ongoing

investigation into the whereabouts of a missing minor, TJ.  (Tr. A 73; Tr. B 13; Tr. D 5).

Shuman testified that he learned the investigation was "an extenuating missing person

[investigation] where a female was potentially in some danger."  (Tr. A 74; Tr. B 14).

According to Shuman, he participated in a briefing about the investigation at

approximately 5:30 p.m. at the East Side police station.  (Tr. D 5, 21).  Shuman recalled that the

briefing included Sergeant Webster and Investigator Turner, Hasper and "maybe" Lebeda.[8]

(Tr. D 21).  After the briefing, he and Investigator Carlton Turner interviewed Justiniano at the

police station.  (Tr. B 17; Tr. D 6, 16, 26).  Shuman estimated that Justiniano arrived at the police

station at approximately 5:30 p.m. and remained there for nearly two hours.  (*Id.*).  When

Justiniano left the station, the individual depicted as "Chrissy" in the Backpage.com

---

[7]  Labeda testified that the message contained in the forensic report contained two discrepancies when
compared against the transcription contained in his investigative action report.  (Tr. E 29-30; G. Ex. 6; Defendant's
Exhibit ("D. Ex.") J).

[8]  Lebeda testified that he did not participate in a briefing at the police station.  (Tr. E 47).

advertisement had not been identified.  (Tr. D 6-7).  About an hour later, Justiniano contacted another officer to advise that a friend of his believed the photograph of "Chrissy" depicted a person named Chelsea Willenborg.  (Tr. A 75; Tr. B 17; Tr. D 7-8, 16-18).  Once the officers learned the name, they reviewed photographs on Facebook, photographs on Backpage.com and "police related photos" to "figure out if it's all one in the same person."  (*Id.*).  The investigation determined that the "Chrissy" depicted on Backpage.com was the same person depicted on Facebook as Chelsea Willenborg, who was currently on probation.  (Tr. D 8-9).  The investigating officers contacted the Probation Department and learned that Willenborg's last known address was 204 Caroline Street.  (Tr. A 75-76; Tr. D 9).  According to Shuman, Caroline Street is off of South Avenue.  (Tr. D 26).

After learning the address, the investigating team prepared to go to the Caroline Street address.  (Tr. D 9).  The team left the police station and met with a probation officer at a parking lot en route to Caroline Street.  (Tr. D 9; Tr. B 21).  The team arrived at 204 Caroline Street approximately thirty to forty-five minutes after learning Willenborg's address, at approximately 10:00 or 10:30 p.m.  (Tr. D 9; Tr. A 76).  When they arrived, Shuman "absolutely" thought TJ "might be there."  (Tr. D 24).

Shuman testified that no consideration was given to obtaining a search warrant for 204 Caroline Street because the process would take too long.  (Tr. D 9-10).  He explained that the warrant process would likely have taken two and a half to four additional hours and:

> We had a 16 year old that we had information was being held
> against her will.  In potential danger physically; certainly mentally
> and psychologically; and also we had a [B]ackpage picture with
> her dressed in scantily clad clothes; and we feared that she was
> potentially a victim of maybe some sexual assault or prostitution
> type deal.

(*Id.*).

10

When the team of officers arrived at 204 Caroline Street, they first encountered a couple who lived in a downstairs apartment.  (Tr. A 76; Tr. B 19).  An individual from the upstairs apartment came downstairs, identified himself as George Cheeks, stated he did not live there and invited the officers upstairs.  (Tr. A 77; Tr. B 23-24).  Shuman remained in the downstairs apartment with the couple.  (Tr. A 77; Tr. B 23).  According to Shuman, he was at 204 Caroline Street for approximately twenty minutes.  (Tr. B 25-26; Tr. D 15-16).

After the other officers were done investigating the upstairs apartment, some officers, including Shuman, went directly to the Best Western Hotel on Jefferson Road to search for TJ.  (Tr. A 78-79; Tr. B 27-28).  TJ and Willenborg were located at the hotel, and Shuman interviewed TJ at the hotel and eventually transported her to the East Side police station.  (Tr. A 80-81, 90; Tr. B 33-36, 43-44, 48-49, 53).  At the hotel, TJ told Shuman that "Michael" was involved.  (Tr. A 80; Tr. B 51-52).

During the course of the interview at the police station, at approximately 1:12 a.m. on the morning of February 9, Shuman showed TJ a six-photograph array containing a photograph of Williams.  (Tr. A 81-82).  The identification procedure took place in a conference room.  (Tr. A 82).  In addition to TJ and Shuman, Investigator Turner was also present.  (Tr. A 83).  Shuman told TJ that he would be showing her a photographic array and that the person who committed the crime may or may not be included.  (Tr. A 85; G. Ex. 2).  He further advised her that persons shown in photos may not appear exactly as they did on the date of the incident. (*Id.*).  He told TJ to take as much time as she needed to view the array and then to indicate whether she recognized anyone.  (Tr. A 85-86; G. Ex. 2).  TJ looked at the array, pointed to photograph number 5, the defendant's picture, and stated "that's Michael."  (Tr. A 87-88; G. Exs. 1, 3).  Shuman testified that TJ identified photograph 5 "almost immediately" and

expressed no reservation about her identification.  (Tr. A 88).  Shuman testified that Williams's

face and the background shading of his photograph appear darker than the others in the array.

(Tr. B 83).


IV.    **Testimony of Scott Gould**

Scott Gould ("Gould"), an investigator with the RPD, testified that he learned

about the ongoing investigation into TJ's whereabouts from Sergeant Webster and Shuman at

approximately 7:30 p.m. on February 8, 2012.  (Tr. A 7-8).  Gould testified that his role included

determining that the photographs posted in the Backpage.com advertisement included some of

the same photographs posted on Chelsea Willenborg's Facebook page.  (Tr. A 8-9, 24-25).  He

was also part of the team that went to 204 Caroline Street at approximately 9:30 or 10:00 p.m.

that night.  (Tr. A 9).  According to Gould, the purpose of the investigation at 204 Caroline Street

was to determine whether TJ was at that location.  (Tr. A 27).

Gould testified that when they arrived at 204 Caroline Street, they began

knocking on the door.  (*Id.*).  A couple returned to the premises from down the street and stated it

was their apartment.  (Tr. A 9, 29).  The officers asked the couple if a young, white woman with

blond hair lived there.  (T. A 10, 29).  They responded that she lived in the upstairs apartment

and was in the process of being evicted.  (*Id.*).  Some officers went to the side of the house to

knock on the side door and observed through the windows some movement in the upstairs

apartment.  (*Id.*).  The couple led Gould and some of the other officers to an inside common

foyer.  (Tr. A 10, 31, 33).  Gould and a probation officer knocked on the door to the upstairs

apartment and identified themselves as police.  (*Id.*).  A man, who later identified himself as

George Cheeks, came downstairs and opened the door, and the officers told him they were

looking for Chelsea and another girl who may be with her.  (Tr. A 10, 33, 35-36).  The officers

asked the man if he lived there.  (Tr. A 53).  According to Gould, the man responded that he did

not live there, that Chelsea was not there and that the officers could go upstairs and look for her.

(Tr. A 10-11, 35, 64-65, 69).

       Upstairs, the officers encountered the defendant, who identified himself as

Michael Williams.  (Tr. A 11, 36).  Gould testified that he recognized him as an individual who

was in photographs with Chelsea on Chelsea's Facebook page.  (Tr. A 11, 13, 36-38).  Williams

told Gould he was not Chelsea's boyfriend and did not live there, although he had had sex with

her in the past.  (Tr. A 11, 53-54).  Gould and the other officers then walked through the

apartment looking for Chelsea and TJ.  (Tr. A 12, 39-40).  In the bedroom, Gould observed an

open laptop computer on the bed.  (Tr. A 12, 44-45).  The laptop screen was lit and displayed a

series of emails arranging a meeting at the Best Western Hotel on Jefferson Road between

Chrissy, a person Chrissy was planning to bring with her, and a third person.  (Tr. A 12-13,

47-49).  Gould testified that he did not touch the computer, nor did he observe any other officer

touch it.  (Tr. A 12, 48).  The officers did not secure or seize the computer.[9]  (Tr. A 50).

       Gould estimated that the officers were inside the Caroline Street premises for

approximately twenty to thirty minutes.  (Tr. A 15).  He then accompanied other officers to the

Best Western Hotel where they located Chelsea and TJ.  (Tr. A 13).

**V.**     **Testimony of Kelly Wilkin**

       Kelly Wilkin ("Wilkin") testified that she works as a Monroe County Probation

Officer.  (Tr. B 86).  In 2012, Chelsea Willenborg was one of her probationers whom she

---

[9]  A search warrant was obtained the next day authorizing the seizure of the computer.  (Docket # 53 at
¶¶ 101-11 and Ex. C).

supervised.  (*Id.*).  Wilkin testified that on February 8, 2012, Willenborg lived at 204 Caroline

Street in Rochester.  (Tr. B 87).  Indeed, Willenborg had confirmed her address to Wilkin as

recently as the morning of February 8, 2012.  (*Id.*).

Wilkin was shown Willenborg's conditions of probation and acknowledged that

the condition authorizing warrantless searches of Willenborg's residence had been crossed out by

the sentencing judge.  (Tr. B 90-92).


**VI.**  **Testimony of Daniel Allen**

Daniel Allen ("Allen") testified that he was working as a Monroe County

Probation Officer on February 8, 2012.  (Tr. C 25).  Allen testified that he and another probation

officer, along with RPD "backup," went to 204 Caroline Street that night to investigate

information that Chelsea Willenborg, a Monroe County probationer, was violating her probation

conditions by harboring a minor and forcing the minor to engage in prostitution.  (Tr. C 25-26,

40).  Allen testified that 204 Caroline Street was Willenborg's address of record.  (Tr. C 26).

Allen also testified about the encounter with the man who answered the door to

the upstairs apartment.  (Tr. C 25-26).  He stated that he introduced himself to the man and asked

if Chelsea Willenborg was there.  (*Id.*).  The man replied that she was not and invited them

upstairs to check.  (*Id.*).

Allen testified that he recognized another man who was at the top of the stairs as

Williams, a former probationer.  (Tr. C 27).  Allen asked Williams if the apartment was

Willenborg's, and Williams responded that it was and that she had been living there since

December 2011.  (Tr. C 28).  Allen stated that he saw the contents of an open laptop screen on a

mattress on the floor of a bedroom.  (Tr. C 28-29).  Allen testified that he did not touch the

computer and did not observe anyone else do so either.  (Tr. C 29).  Allen and his fellow

probation officer left the residence shortly thereafter.  (Tr. C 30).


## DISCUSSION

**I.**     **The Emergency Aid Doctrine**

At issue in this case is whether the emergency aid doctrine, a subset of the exigent

circumstances doctrine, *see Brigham City, Utah v. Stuart*, 547 U.S. 398, 403-04 (2006);

*Sutterfield v. City of Milwaukee*, 751 F.3d 542 (7th Cir.), *cert. denied*, 135 S. Ct. 478 (2014),

justifies the officers' warrantless entry and search of the Caroline Street apartment.  The

emergency aid exception to the warrant requirement permits "law enforcement officers '[to]

enter a home without a warrant to render emergency assistance to an injured occupant or to

protect an occupant from imminent injury.'"  *See Michigan v. Fisher*, 558 U.S. 45, 47 (2009)

(quoting *Brigham City, Utah v. Stuart*, 547 U.S. at 403); *see also Montanez v. Sharoh*, 444

F. App'x 484, 486 (2d Cir. 2011) ("[p]olice officers may enter a dwelling without a warrant to

render emergency aid and assistance to a person whom they reasonably believe to be in distress

and in need of that assistance") (quoting *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998)).

As the Seventh Circuit recently explained:

> [The] emergency aid doctrine . . . recognizes that a warrantless
> entry into the home may be appropriate when police enter for an
> urgent purpose other than to arrest a suspect or to look for evidence
> of a crime. . . . [T]his doctrine recognizes that police play a service
> and protective role in addition to a law enforcement role. . . .
> [P]olice officers may sometimes need to enter a dwelling in order
> to render aid to an occupant whom they believe to be in distress
> and in immediate need of their assistance.

*Sutterfield v. City of Milwaukee*, 751 F.3d at 557-58 (citations omitted).  The test to determine

the applicability of the emergency aid doctrine is an objective one, *see Michigan v. Fisher*, 558

U.S. at 47; *Brigham City*, 547 U.S. at 404, and inquires "whether the police, given the facts confronting them, reasonably believed that it was necessary to enter a home in order to render assistance or prevent harm to persons or property within." *Sutterfield*, 751 F.3d at 558 (internal quotation omitted).

The defining characteristic of the emergency aid doctrine, just like the exigent circumstances doctrine, is a "time-urgent need to act." *Sutterfield*, 751 F.3d at 559-60; *accord Anthony v. City of New York*, 339 F.3d 129, 135 (2d Cir. 2003) ("[t]he essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action"); *United States v. Paige*, 493 F. Supp. 2d 641, 647 (W.D.N.Y. 2007). Where the two doctrines diverge is their consideration of the availability or practicality of obtaining a warrant. *Sutterfield*, 751 F.3d at 559-60. For the exigent circumstances exception to apply, the police must have bypassed a warrant because the urgent need to act made resort to the warrant process impractical, not because they lacked probable cause to obtain one. *Id.* at 557; *see also Michigan v. Tyler*, 436 U.S. 499, 509 (1978) ("a warrantless entry by criminal law enforcement officials may be legal when there is a compelling need for official action and no time to secure a warrant"). In other words, where "there is time for the police to seek a warrant, then one must be sought." *Sutterfield*, 751 F.3d at 559-60.

The emergency aid doctrine, by contrast, does not generally consider the practicality of the warrant process because "in emergency aid cases, where the police are acting to protect someone from imminent harm, there is frequently no suspicion of wrongdoing at the moment that the police take action." *Id.* at 564. Accordingly, there is "no logical need to additionally consider probable cause and the availability of a standard criminal warrant." *Id.* at

16

560. Stated another way, "[i]t may be, then, that probable cause in the emergency aid context is not reason to believe a crime is occurring or has been committed, but reason to believe that someone is in need of aid and there is a compelling need to act." *Id.; see also Koch v. Town of Brattleboro, Vt.*, 287 F.3d 162, 169 (2d Cir. 2002) ("probable cause for a forced entry in response to exigent circumstances requires finding probability that a person is in danger") (internal quotations omitted); *United States v. Gordon*, 741 F.3d 64, 70 (10th Cir. 2014) ("[o]fficers do not need probable cause if they face exigent circumstances in an emergency"); *United States v. Timmann*, 741 F.3d 1170, 1178 n.4 (11th Cir. 2013) ("in an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger"); *United States v. Infante*, 701 F.3d 386, 392-93 (1st Cir. 2012) ("the burden is on the government to show a reasonable basis, approximating probable cause, both for the government official's belief in the existence of an emergency and for associating the perceived emergency with the area or place to be searched"), *cert. denied*, 133 S. Ct. 2841 (2013); *United States v. Stafford*, 416 F.3d 1068, 1075 (9th Cir. 2005) (unavailability or impracticability of warrant "is not part of the emergency doctrine").

Rather, the critical considerations are whether the police reasonably believed that entry into a home was necessary to render assistance or prevent harm to someone in the home and whether they acted in an "expeditious, if not immediate" manner consistent with the professed urgency. *Sutterfield*, 751 F.3d at 563; *see also United States v. Kenfield*, 270 F. App'x 695, 696 (9th Cir.) (emergency aid doctrine also requires consideration of the reasonableness of the search's scope and manner to meet the emergency need), *cert. denied*, 555 U.S. 868 (2008). "Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the

emergency aid exception." *Fisher*, 558 U.S. at 49 (internal quotations omitted).  Of course, as in all Fourth Amendment inquiries, the touchstone is reasonableness.  *Id.* at 47.

In this case, the credible testimony establishes that from the time that the initial 911 call report was received, the RPD worked intensively and expeditiously to locate and recover TJ.  The testimony further demonstrates that the focus of the investigation was to find the minor, and RPD deployed substantial effort and resources in that investigation.

As the record shows, TJ's aunt made a 911 call shortly before 4:00 p.m. on February 8, 2012 to report that her sixteen-year-old niece was missing and being held against her will for prostitution.  Officers Hasper and Lebeda were promptly dispatched to TJ's aunt's house and arrived a few minutes later at approximately 4:00 p.m.  Their supervisor, Sergeant Webster, arrived on scene shortly thereafter and coordinated the investigation.  Webster contacted Investigator Shuman shortly after Shuman's shift began at 4:00 p.m. to brief him on the investigation and direct him to stand-by because his services would likely be needed.

Officers Lebeda and Hasper interviewed TJ's aunt, who advised them that her belief that her niece was being held against her will was based upon information she had learned from her son, Nicholas Justiniano, TJ's cousin.  The officers interviewed Justiniano and learned that he had been communicating by text message with TJ that afternoon beginning at about 2:00 p.m. and that she had told him she could not leave her location because she was afraid she would be beaten if she did.  Justiniano further explained that at school that day he had seen an advertisement on Backpage.com featuring TJ.  Justiniano showed the officers the texts that had been exchanged before they arrived on scene.  One of the incoming texts from the phone number that Justiniano identified as TJ's stated:

18

> I don't want to do this but the guy who tricked me into this shit
> won't let me[.]  I'm not fucking no one thow cause I just can't do
> that to myself and if I tell u where I'm at I will get beat.

That message was received by Justiniano at 2:57 p.m.

Justiniano also showed the officers a copy of the Backpage.com advertisement depicting photographs of two scantily and provocatively-clad females, one of whom he identified as TJ.  The advertisement, which purported to be posted by the other female identified as "Chrissy," offered "DOUBLES," stating, "2 is so much more fun than just one."  The officers reasonably understood the advertisement to offer prostitution services.  The advertisement provided a phone number to contact "Chrissy" and identified the location as "Rochester, My place? Southwedge."

Officer Hasper took the two phone numbers associated with TJ – the one with which Justiniano was exchanging text messages and the number in the Backpage.com advertisement – and promptly began to investigate them.  Working with others in the department, the carrier was identified and contacted, and the officers ascertained a subscriber name and address – which was the same for both phones.  A third officer was promptly dispatched to that address on the west side of Rochester to attempt to interview the subscriber.

In the meanwhile, Officer Lebeda remained with Justiniano, who continued to communicate with TJ.  TJ's further texts included a message cautioning Justiniano about calling her: "Don't call me cuz theres 3 Big ass nikkaz here and they will take the fone and beat me if they find out it's u."  TJ told Justiniano that she was located "off [S]outh av[enue]," told Justiniano she was scared to leave because "w[h]at if they wake up" and inquired whether Justiniano was sure he could come get her.

Justiniano, driving his own car, accompanied the officers back to the East Side police station.  Lebeda arrived at approximately 5:17 p.m.  There, Lebeda transcribed the text messages that had taken place between Justiniano and TJ (except for the first two he had seen, which he had transcribed earlier while on scene at TJ's aunt's house).  A briefing was held at the police station at approximately 5:30 p.m., which was attended by various officers, including Sergeant Webster and Investigators Shuman and Turner.  Investigator Shuman also interviewed Justiniano when he was at the police station.

In the meanwhile, after the officers learned that the effort to find the subscriber of record for the phones had failed, Officer Hasper began an investigation to determine the GPS location of the phone TJ was apparently using to text Justiniano.  Again, the carrier was contacted, and Hasper and Lebeda were able to ascertain that the most recent communication had "hit" off of the 500 South Avenue cell phone tower, indicating that the signal was coming from south of the cell tower location.  According to Hasper, that location was within the "Southwedge" neighborhood.

Justiniano remained at the police station for nearly two hours and returned not long thereafter, while Lebeda was still working on obtaining the GPS location for TJ's phone. He met with Officer Lebeda and Sergeant Webster when he returned and told them that he believed that "Chrissy" was Chelsea Willenborg.

Lebeda immediately advised investigators of Justiniano's information, and Shuman and Gould promptly undertook investigative efforts to attempt to confirm whether "Chrissy" was in fact Chelsea Willenborg.  To do that, they compared photographs of the "Chrissy" in the Backpage.com advertisement with photographs of a Facebook page for Chelsea Willenborg and observed some of the same photographs on both pages.  They also compared the

photographs with some police photographs of Chelsea Willenborg.  They determined that all three sets of photographs appeared to depict the same woman.  Lebeda also reviewed Willenborg's Facebook page and found a photograph of TJ and Willenborg together.

Investigators also determined that the Chelsea Willenborg depicted in the photographs was currently on probation supervision with the Monroe County Probation Department.  The investigators contacted the Monroe County Probation Department and learned that her current address of record was 204 Caroline Street.  Immediately upon learning Willenborg's address, the investigating team made plans to go to that location to look for TJ. The team assembled, prepared to deploy, arranged to pick up two probation officers to join the team and proceeded to 204 Caroline Street.  Sergeant Webster, Investigators Shuman, Turner and Gould, Officers Hasper and Lebeda and two County probation officers arrived at 204 Caroline Street at about 9:53 p.m., approximately thirty to forty-five minutes after learning Willenborg's address.  Once they entered Willenborg's apartment, they searched the apartment looking for TJ and Willenborg.  They found neither, although they detained Williams and observed in plain view information on a computer revealing that a meeting had been arranged by "Chrissy" for the Best Western Hotel.  The emails revealed that "Chrissy" planned to bring someone with her to the hotel meeting.  Various members of the team went directly to the hotel from Caroline Street, where they recovered TJ.

Taken together, the facts adduced at the hearing, demonstrate that a team of officers responded immediately to a report of a minor being held against her will for prostitution. The seriousness with which the report was taken is evidenced by the fact that a Sergeant responded to the scene and put an investigator on immediate stand-by for anticipated assistance. The team working on the investigation eventually grew to include the Sergeant, three

investigators and at least three officers.  The investigating officers reviewed text messages that the minor's cousin advised came from her and supported the belief that she was being held against her will at a location off South Avenue and was afraid she would be beaten if she tried to leave.  An advertisement on an "escort" website reasonably suggested that she was involved in prostitution activities with another female whose location in the advertisement was identified as the "Southwedge" neighborhood.

The investigating team acted expeditiously to interview the minor's cousin with whom she had been texting and her aunt who had placed the 911 call.  The team attempted to locate and interview the subscriber for the two phones associated with the minor.  Officer Lebeda continued to monitor and make a record of the minor's text communications with her cousin.  In the meanwhile, the officers also attempted to determine the GPS location for the minor's phone.  Within hours, with the assistance of the minor's cousin, the officers had identified the other woman in the prostitution advertisement as a current probationer with a current address of 204 Caroline Street – a street located in the Southwedge neighborhood, directly off South Avenue.  Approximately six hours after receiving the 911 report, the RPD investigating team arrived at the Southwedge residence of the woman identified as "Chrissy" in the advertisement to attempt to rescue the minor.

The officers' warrantless entry into and search of the apartment was justified under the circumstances by the emergency aid doctrine.  They had credible evidence that a minor was being held against her will and possibly subject to violence if she attempted to leave.  They had credible evidence that she was involved in prostitution activity with Willenborg.  Further, they had reasonable grounds to believe that she was being held in Willenborg's apartment at 204 Caroline Street – an apartment on a street "off [S]outh av[enue]," just as TJ's text message at

4:37 p.m. that afternoon had indicated; located in the Southwedge neighborhood identified by the Backpage.com advertisement; and, consistent with the GPS cell phone location.

Warrantless searches for victims reasonably believed to be in distress have been held not to violate the Fourth Amendment under similar circumstances. *See, e.g., Sutterfield*, 751 F.3d at 566 ("it was objectively reasonable for the officers to believe that their intervention was required in order to prevent [the plaintiff] from harming herself . . . [;] [t]he forced entry into [her] home was reasonable under the circumstances"); *United States v. Wood*, 542 F. App'x 208, 212 (3d Cir. 2013) ("the officers had an objectively reasonable basis to believe that an individual inside the home was in danger[;] . . . [they] were therefore authorized to enter the home to search for a victim or to determine whether there was an ongoing threat of imminent harm"); *Hunsberger v. Wood*, 570 F.3d 546, 555 (4th Cir. 2009) ("a reasonable officer could conclude that prompt entry was necessary in order to protect the . . . home from potential damage and to locate a missing [teenage] girl who might be in harm's way"), *cert. denied*, 559 U.S. 938 (2010); *United States v. Kenfield*, 270 F. App'x at 698 (warrantless search justified officer's reasonable belief for "concluding that there was an immediate need to protect a minor female from serious harm [of sexual contact]");*United States v. Thomas*, 2015 WL 164075, *5 (D. Conn. 2015) (warrantless entry into hotel room reasonable where officers had reason to believe minor was in room and potentially being sexually exploited; "the Fourth Amendment never demands certainty . . . in the context of emergency aid searches it demands only an objectively reasonable basis for belief") (internal quotation omitted); *United States v. Coffelt*, 2013 WL 1837947, *4 (E.D. Tenn.) (warrantless search reasonable where 911 call from identified third party stated that her daughter was beaten and being held against her will), *report and recommendation adopted by*, 2013 WL 1837934 (E.D. Tenn. 2013); *United States v. Gilliam*, 2012 WL 4044632, *2

(S.D.N.Y. 2012) ("[i]t has been sensibly held that the potential sexual exploitation of a minor is an exigent circumstance") (citations omitted); *United States v. King*, 560 F. Supp. 2d 906, 916 (N.D. Cal. 2008) (warrantless entry reasonable to meet need to protect minor from likelihood of sexual contact).

    I likewise find that the RPD officers in this case reasonably believed there was an urgent need to act to locate and retrieve a minor being held against her will and in fear of physical violence.  Four members of the investigating team testified, and their testimony credibly demonstrates that they and the other team members acted diligently and with dispatch to investigate the 911 report and to locate an address where they reasonably believed she might be found.  The minor's text messages, coupled with the Backpage.com advertisement and GPS location of the phone, established reasonable cause to believe that she was in distress, needed to be recovered and was at Willenborg's apartment in the Southwedge neighborhood.  The focus from the inception of the investigation to the minor's eventual recovery later that night was on finding and rescuing the minor, as evidenced by the reasonable manner and limited scope of the officers' search or sweep of Willenborg's apartment, which was undertaken to locate persons, not evidence.  *See, e.g., United States v. Gordon*, 741 F.3d at 70 ("[a]ny officer could reasonably believe an unprotected victim in that situation was in imminent danger of serious harm[,] [b]ut that does not end the reasonableness debate because a search must be reasonable not only in its inception but also in its execution"); *Kenfield*, 270 F. App'x at 697 (search for missing juvenile reasonable where it was confined to locating juvenile and other people inside trailer); *United States v. Coffelt*, 2013 WL 1837947 at *4 (Fourth Amendment permits "limited search . . . [or] protective sweep" where police reasonably believe person within residence is in need of immediate aid or protection); *United States v. Paige*, 493 F. Supp. 2d at 650 (fact that officers

continued to search apartment after learning no victim was present "strongly suggests [their] motivation was primarily to solve a crime . . . not to save a life"). As courts have frequently acknowledged, "when police are acting in a swiftly developing situation . . . [;] a court must not indulge a unrealistic second-guessing." *Leaf v. Shelnutt*, 400 F.3d 1070, 1092 (7th Cir. 2005) (internal quotation omitted); *see also Hunsberger v. Wood*, 570 F.3d at 557 ("while it is tempting to second-guess an officer's actions, it is also true that real harm to persons and property could result if police tried to act with the calm demeanor associated with the judicial process) (internal quotation omitted).

In sum, I find that the officers' warrantless entry and limited search of 204 Caroline Street was reasonable within the meaning of the Fourth Amendment. I further find that the police officers' observation of information on the open and visible laptop screen was justified by the plain view exception to the warrant requirement. *See United States v. Herndon*, 501 F.3d 683, 693 (6th Cir. 2007) (laptop properly seized without warrant where officer observed pornographic images of minor children in plain view while lawfully in defendant's residence). *But see United States v. Mark*, 2009 WL 5286598, *4 (D.V.I. 2009) (viewing computer screen to read words contained on screen exceeded scope of protective sweep). Accordingly, I recommend that the district court deny Williams's motion to suppress evidence obtained as fruit of an unlawful search of 204 Caroline Street.

## II.   The Government's Other Purported Justifications

The government also argues that the officers' warrantless entry and sweep of 204 Caroline Street is justified under the more traditional exigent circumstances doctrine. I need not, and do not, reach this question because the facts, in my estimation, fit appropriately within the

emergency aid doctrine.  Although the test under either the emergency aid or exigent

circumstances doctrine is an objective one, it is nonetheless clear from the record that these

officers were subjectively motivated by a desire to find and retrieve a minor whom they believed

to be in distress and in harm's way.  Their actions were entirely consistent with that objective

and, as explained in the preceding section, were objectively reasonable under the Fourth

Amendment.

In addition, the government originally sought to justify the officers' warrantless

entry on the grounds that they reasonably believed they had consent to do so.  As I have

repeatedly advised the government, I do not believe the facts support that argument.  A third

party, George Cheeks, answered the door to the apartment.  Although he invited the officers into

the apartment to look for the minor and Willenborg, he explicitly told them he did not live there.

The officers asked him no follow-up questions.  The officers' knowledge that he did not live

there, unaccompanied by any evidence of his relationship, if any, to Willenborg or his reason for

being present in the apartment, belies any suggestion that they reasonably believed Cheeks had

the authority to consent to their entry into and search of Willenborg's apartment.  *See Illinois v.*

*Rodriguez*, 497 U.S. 177, 188-89 (1990) ("determination of consent to enter must be judged

against an objective standard: would the facts available to the officer at the moment warrant a

man of reasonable caution in the belief that the consenting party had authority over the

premises[;] [i]f not, then warrantless entry without further inquiry is unlawful unless authority

actually exists") (internal quotation and citation omitted); *Garcia v. Dykstra*, 260 F. App'x 887,

900-01 (6th Cir. 2008) (facts of which officer was aware obligated the officer to "engage in

further inquiry concerning [individual's] apparent authority to consent to a search"); *Moore v.*

*Andreno*, 505 F.3d 203, 213 (2d Cir. 2007) ("with the specific knowledge that [the third party]

26

was not permitted to enter the study and had used force to gain access, the [police] could not validate their warrantless search of [the] study on the basis of consent"); *United States v. Cos*, 498 F.3d 1115, 1130-31 (10th Cir. 2007) (consent exception not established where officers made no further inquiry of person who answered door to another's apartment and simply advised that she was there with "her kids"; further inquiry was warranted); *United States v. Green*, 2010 WL 4877872, *7 (N.D. Ga. 2010) (although it was "undisputed that [the individual] invited [the officer] to enter his uncle's apartment[,] . . . [g]iven the situation [the officer] faced, including his knowledge that [the individual] did not reside in the apartment, [the officer] had a duty to make further inquiry before accepting the invitation"); *Horan v. City of Chicago*, 2010 WL 2836729, *3 (N.D. Ill. 2010) ("[t]he fact that [individual] had no manner of identification on him, appeared intoxicated, and did not have the means to access the apartment on his own made [the individual's] authority highly questionable and obligated the officer to inquire further as to his authority"); *United States v. Corral*, 339 F. Supp. 2d 781, 796, 798 (W.D. Tex. 2004) ("agents . . . failed to conduct the sufficient inquiry that could have provided them with a proper basis for assessing [third party's] ability to consent" where all they knew was that third party was housekeeper for entire house, was the only adult at home and did not own or live in the premises).

III.     **The Photographic Identification Procedure**

Williams moves to suppress evidence of TJ's identification of a photograph of him contained in an array shown to her at the police station following her recovery from the hotel. Williams contends that his photograph was so much darker than the other photographs in the array as to render the array unduly suggestive. He also maintains that suppression is

warranted because the record does not establish that TJ has an independently reliable basis upon which to identify Williams.  (Docket # 86 at 12).  The government opposes the suppression motion.  (Docket # 89 at 16-18).

Evidence of an out-of-court photographic identification will be suppressed under the due process clause if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).  In determining whether to exclude evidence of a pretrial identification, a court must first consider whether the identification procedure was unduly suggestive.  *Id*.  To decide whether a photographic array is unduly suggestive, a court should consider several factors including "the size of the array, the manner of presentation by the officers, and the array's contents."  *United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990), *cert. denied*, 501 U.S. 1233 (1991).  Specifically, the court must consider "whether the picture of the accused . . . so stood out from all of the other photographs as to suggest to an identifying witness that [the accused] was more likely to be the culprit."  *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (internal citations and quotations omitted).

If the identification procedure was unduly suggestive, the court must proceed to determine whether the identification nevertheless possesses "sufficient aspects of reliability." *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. 98, 109-17 (1977)), *cert. denied*, 434 U.S. 872 (1977).  "Even if the procedure was unnecessarily (or impermissibly) suggestive . . .[,] a district court may still admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'"  *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*,

923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862

(1994).

        At the government's request, this Court bifurcated the *Wade* hearing.  To date, the

government has offered evidence relating only to the issue of the suggestiveness of the

procedure.  Of course, no continuation of the hearing is necessary if the court determines that the

procedure was not unduly suggestive.  On the other hand, if the court finds that the procedure

was impermissibly suggestive, the hearing must be continued to determine whether the

identification is independently reliable.

        On the record before the Court, I find that the identification procedure was not

unduly suggestive.  First, the manner in which Shuman presented the array to TJ in no way

suggested which, if any, photograph to select.  Rather, Shuman advised TJ that the array may or

may not include a photograph of the person who committed the crime, and the individuals may

look different in the array than they appear in person.  With respect to complexions, Shuman

advised TJ that "[p]hotos may not always show the true complexion of a person; it may be darker

or lighter than shown in the photo."  (Tr. A 85-86; G. Ex. 2).  She was told to take her time and

indicate whether she recognized anyone.  Without hesitation or reservation, she identified

photograph number 5 as "Michael."

        Nor was the array itself unduly suggestive.  In the original array presented to TJ,[10]

Williams's photograph is one of six color photographs of different African-American men.

(G. Ex. 1).  All are head shots of men with closely-cut or short hair with moustaches.  Four,

including Williams, do not appear to have beards, while two do – one with a fuller one than the

other.  Williams and two others feature fairly thick eyebrows.  Williams and two other men

---

[10] This Court has inspected the original array.  Williams's photograph in the original array is not as dark as it is in the copy admitted in the hearing as G. Ex. 1.

appear slightly older than the other three men shown and, although the men have skin tones of

different complexions, Williams's complexion appears darker than three others and somewhat

darker than the other two.  The background shading of his photograph is also darker than the

background hues of the other.  Although under certain circumstances, differences in backgrounds

or complexions may "draw the viewer's eye" to a particular photograph creating the possibility

that the photographic array is unduly suggestive, *see United States v. Young*, 2012 WL 5245305,

*4 (W.D.N.Y. 2012), *report and recommendation adopted*, 2013 WL 6154411 (W.D.N.Y.

2013), all facts considered, I do not find that Williams's photograph so stood out from the others

as to be unduly suggestive.  *See, e.g.*, *United States v. Gay*, 423 F. App'x 873, 877 (11th Cir.

2011) (array not unduly suggestive despite defendant's contention that his "background and his

complexion are significantly darker than the other pictures in the photo array[;] . . . [t]he district

court's finding that these differences were insignificant, and did not affect the suggestiveness of

the procedure, was not clearly erroneous"); *United States v. Harris*, 636 F.3d 1023, 1026-27 (8th

Cir. 2011) (array not unduly suggestive where defendant's photograph was the only one with a

blue or violet hued background; "[t]he slightly different backgrounds do not render the lineup

impermissibly suggestive") (collecting cases); *United States v. Knight*, 382 F. App'x 905, 907

(11th Cir. 2010) ("[a]lthough [defendant] was of a lighter complexion than four of the other

individuals in the array and the background lighting in his photograph was slightly different from

some of the other photographs, neither of those differences [was] stark enough so as to be unduly

suggestive"); *United States v. Thai*, 29 F.3d 785, 809 (2d Cir.) (array was not unduly suggestive

where array contained photographs of men with a wide variety of hairstyles and with and without

facial hair), *cert. denied*, 513 U.S. 993 (1994); *United States v. Bautista*, 23 F.3d at 731 ("[w]hile

it is true that the photograph of [the defendant] is slightly brighter and slightly more close-up

than the others, we find that these differences did not render the array suggestive"); *United States v. Maldonado-Rivera*, 922 F.2d at 974 ("[t]he fairness of a photographic array depends on a number of factors, including the size of the array, the manner of presentation by the officers, and the array's contents"); *United States v. Marrero*, 705 F.2d 652, 655 n.5 (2d Cir. 1983) (six is an acceptable number for a photographic array); *United States v. Wrensford*, 2014 WL 1218398, * 4 (D.V.I. 2014) ("[m]inor differences such as fullness of face, size of head, or complexion, are not indicia of suggestiveness, much less undue suggestiveness that implicates constitutional violations in the identification process") (collecting cases); *Robinson v. Artus*, 664 F. Supp. 2d 247, 259 (W.D.N.Y. 2009) ("differences in complexion tones between subjects in an identification procedure, standing alone, does not create an unduly suggestive procedure");*United States v. Joseph*, 332 F. Supp. 2d 571, 581-82 (S.D.N.Y. 2004) (photographic array was not unduly suggestive where array contained six photographs of individuals of similar ethnicity, age, hairstyle and facial hair).  The lack of undue suggestiveness is underscored here, where the witness was specifically instructed that the complexions of the individuals depicted in the array may actually have been be lighter or darker than depicted.  *See United States v. Lawson*, 410 F.3d 735, 739 (D.C. Cir.) (array not suggestive where defendant contended that his complexion was lighter than that of the others, at least one other photograph appeared comparable and officer instructed the witness that "photographs may not always depict the true complexion of a person and that such complexion may be lighter or darker than shown in the photo"), *cert. denied*, 546 U.S. 1055 (2005).

      Accordingly, I recommend that the district court deny Williams's motion to suppress TJ's photographic identification.

IV.     **Dismissal of the Indictment**

Finally, Williams moves to dismiss the indictment on the grounds of outrageous government conduct.[11]  Specifically, he argues that the officers' conduct in entering and searching Willenborg's apartment without a warrant, looking at the material on the laptop computer and detaining the persons present in the apartment (Williams and Cheeks) was so lacking in legal justification that it violated the Due Process Clause and warrants dismissal of the indictment.  (Docket # 53 at 51-52).  I recommend that the district court deny this motion.

I have already found that the officers' actions in entering the apartment and searching it for TJ and Willenborg was reasonable under the Fourth Amendment.  So too was the officers' observation of email communications on display in plain view on the laptop screen visible on the bed.  I further find, under the circumstances confronting the officers, that their investigative detention of Williams during the sweep of the apartment and pending the immediate further investigation at the hotel did not constitute outrageous government conduct.[12]  *See*, *e.g.*, *United States v. Scroggins*, 599 F.3d 433, 445 (5th Cir.) ("[i]t follows that if a protective sweep for potentially dangerous individuals *locates* such an individual, police may detain and frisk the subject, and, if necessary, temporarily handcuff or otherwise reasonably

---

[11]  This Court incorrectly read Williams's original omnibus motion papers to include motions to dismiss the indictment on the basis of grand jury irregularities and improper instructions.  (Docket ## 53, 59).  In fact, Williams's papers do not include such motions.  Rather, they request disclosure of grand jury minutes on the basis of the speculative assertion that irregularities may have occurred before the grand jury.  Such speculation does not justify disclosure of grand jury minutes, and William's motion is thus denied.  *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959); *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) ("[a] review of grand jury minutes should not be permitted without concrete allegations of [g]overnment misconduct"); *United States v. Shaw*, 2007 WL 4208365, *6 (S.D.N.Y. 2007).

[12]  Although not articulated, to the extent that Williams's pre-arrest transportation to and detention at the East Side police station may have violated the Fourth Amendment, *see Hayes v. Florida*, 470 U.S. 811, 816 (1985) ("the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes"), no evidence or statements (other than permissible pedigree information) were obtained as a result of his investigative detention, as the defense has conceded.  (*See* Docket # 81 at 48-49).

immobilize him"), *cert. denied*, 131 S. Ct. 158 (2010); *United States v. Obbanya*, 2012 WL

851129, * 5 (N.D. Cal. 2012) (officers conducting a sweep of residence in response to a 911

hang-up call had authority to detain defendants; "[a]n officer's authority to detain incident to a

search is categorical") (quoting *Muehler v. Mena*, 544 U.S. 93, 98 (2005)); *Crismale v. Reilly*,

2014 WL 3738151, * 4 (D. Conn. 2014) (officers with "reasonable and articulable suspicion of

criminal activity" may detain individuals pending investigation and "where law enforcement

officers have conducted their investigations without needless delay, numerous courts have found

investigative detentions of fairly substantial length – anywhere from thirty minutes to nearly

three hours – to be constitutionally reasonable") (collecting cases).  On these facts, dismissal of

the indictment under the Due Process Clause is not warranted.


## CONCLUSION

Accordingly, I recommend that the district court deny Williams's motions to

suppress evidence seized as a result of a warrantless entry into and search of 204 Caroline Street

on February 8, 2012, to suppress evidence of a photographic identification procedure conducted

with TJ several hours later, and to dismiss the indictment.  (Docket ## 53, 86, 106).


                                             *s/Marian W. Payson*
                                        MARIAN W. PAYSON
                                        United States Magistrate Judge


Dated: Rochester, New York
        February 2, 2015

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

>       **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

>       **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[13]

>       The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

>       **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

>       The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

>       Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
         February 2, 2015

---

[13]   Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).